IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 1, 2024

## STEVEN KYLE LEATH v. ANGELEA NICOLE FLOWERS

**Appeal from the Juvenile Court for Chester County**
**No. 23-JV-2357      Angela R. Scott, Judge**

_____

**No. W2024-00047-COA-R3-JV**

_____

Mother and Father entered into an Agreed Permanent Parenting Plan.  Thereafter, Father learned of information he allegedly was not privy to before, namely, that the Mother's new husband was physically abusive, had been using drugs, and has an extensive criminal record; additionally, new incidents involving domestic violence and other criminality occurred involving Mother's new husband.  In response, Father sought to modify the parenting plan.  The Juvenile Court modified the plan, reducing the number of days of Mother's visitation and limiting Mother to supervised visitation.  Mother appeals the trial court's modifications.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

JEFFREY USMAN, J., delivered the opinion of the court, in which THOMAS R. FRIERSON, II, and KENNY W. ARMSTRONG, JJ., joined.

Alexander D. Camp, Jackson, Tennessee, for the appellant, Angelea Nicole Flowers.

Andrea D. Sipes, Jackson, Tennessee, for the appellee, Steven Kyle Leath.

**OPINION**

I.

Steven Kyle Leath (Father) and Angelea Nicole Flowers (Mother) are the parents of a minor child K.L., who was born in 2021.  Mother and Father were not married, and they separated when K.L. was six months old.  Following their separation, Father filed with the Chester County Juvenile Court to establish parentage, a permanent parenting plan, and child support.  The proceedings ultimately resulted in the Chester County Juvenile Court

issuing an Agreed Permanent Parenting Plan Order (Parenting Plan), designating Father as the primary residential parent, and awarding Father 183 days of parenting time and Mother 182 days of parenting time.

This Parenting Plan was short-lived. On September 13, 2023, responding to Father's decision to withhold K.L., Mother filed a pro se Motion for Contempt against Father. Father promptly filed a pro se Petition for Emergency Custody. The Juvenile Court heard Father's Petition for Emergency Custody, resulting in the issuance of an Order for Temporary Supervised Visitation, which suspended Mother's parenting time as set forth in the Parenting Plan. The trial court's order mandated that any visitation instead be conducted in the presence of an approved supervisor[1] and forbid contact with Mr. David Bryan, Mother's new husband.

Father filed a Complaint to Modify the Parenting Plan, alleging a material change in circumstances occurred and asserting that modifying the Parenting Plan would be in K.L.'s best interest. Father alleged modification was proper in light of: Mr. Bryan's assaults of Mother on July 30, 2023 and August 1, 2023; Mother's decision to reconcile with Mr. Bryan after she was the victim of physical abuse by him; Mr. Bryan's pending criminal charges for aggravated assault and aggravated burglary and his apprehension following his failed attempt to flee from law enforcement; Father's discovery of Mr. Bryan's extensive criminal record; and Father's belief that Mother cannot properly provide for K.L.

The Juvenile Court conducted a hearing on Father's request for modification and Mother's Motion for Contempt on October 31, 2023. The hearing revealed several serious incidents that occurred after the finalization of the Parenting Plan, wherein Mr. Bryan became physically violent with Mother and Mr. Bryan's minor daughter. On July 29, 2023, twenty-three days after the Parenting Plan was entered, Mother witnessed Mr. Bryan assault his fifteen-year-old daughter. Mr. Bryan and his daughter had an argument during which Mr. Bryan grabbed her backpack, yanked her backward, broke her phone, and hit her.[2] Thereafter, there were two instances of domestic assault wherein Mother was the victim of Mr. Bryan. On July 30, 2023, twenty-four days after the Parenting Plan was entered, Mr. Bryan was charged with domestic assault. The assault occurred as Mr. Bryan and Mother were preparing to pick up K.L. for Mother's visitation. The argument that led to the assault arose in connection with the manner in which Mother was installing K.L.'s car seat. Evidence revealed Mr. Bryan threw a plate of food at Mother, reached at Mother

---

[1] Within the Order for Temporary Supervised Visitation, the Juvenile Court designated the following persons as permissible supervisors: Judy Davis (maternal grandmother), Teresa Nickell (paternal grandmother), and Haley Stephens (maternal sister).

[2] Judy Davis (Ms. Davis)—Mother's mother—testified that she watched a video Mother possessed that captured the assault between Mr. Bryan and his daughter.

as if he were going to strangle her, and physically placed Mother into a bear hug until she was able to contact the police. Following Mr. Bryan's domestic assault charge, the Jackson City Court issued a no-contact order mandating no contact between Mother and Mr. Bryan (No Contact Order). Mother, however, willfully disobeyed the No Contact Order.[3] Furthermore, Mother declined to pursue the domestic violence charge against Mr. Bryan, which resulted in its dismissal. On August 1, 2023, twenty-six days after the entry of the Parenting Plan, Mr. Bryan perpetrated a simple assault against Mother. The Jackson Police Department reportedly documented this simple assault wherein Mr. Bryan swung at Mother, striking her in her hand. Mr. Bryan allegedly told law enforcement both he and Mother were using methamphetamine and had been doing so for an extended period of time.

In addition to the aforementioned incidents, following implementation of the Parenting Plan, Mr. Bryan was also charged with aggravated burglary and aggravated assault. On July 20, 2023, fourteen days after the Parenting Plan was entered, the alleged aggravated burglary and aggravated assault occurred. Following this incident, Mr. Bryan fled the jurisdiction, but he was subsequently apprehended in Alabama by the United States Marshall Service.

Initially, Mother moved out and into a hotel. Nevertheless, Mother returned to Mr. Bryan, sparking Father's concern for K.L.'s safety. Mother's return to Mr. Bryan led Father to withhold K.L. from Mother to protect K.L. As noted above, Father's withholding of K.L. prompted Mother's Motion for Contempt against Father and Father's Petition for Emergency Custody.

At the Modification Hearing, Mother testified that she and Mr. Bryan no longer fight, and that they now regularly attend church together. Mother explained that even when they had previously fought, she believed she consistently screened K.L. from such fighting by asking Father to pick up K.L. whenever a fight occurred. She clarified that the occasions she asked Father to pick up K.L. were verbal disagreements.

Despite Mother's positive testimony regarding Mr. Bryan and their relationship, testimony from others raised serious concerns. Father testified that Mother disclosed Mr. Bryan threatened to kill her, and Mother's mother (Ms. Davis) similarly testified that Mother revealed she was scared for her life. Ms. Davis further testified that herself, Mother, and Haley Stephens (Mother's Sister) watched through a camera as Mr. Bryan told a friend he would kill Mother and Ms. Davis if he went to jail again. According to Ms. Davis, after one incident, Mother's hand was cut and injured and she could see glass in Mother's hand. Mother told Ms. Davis she had broken through a window or glass door in

---

[3] Mother testified that she asked Judge Anderson to drop the No Contact Order, but Judge Anderson refused. Mother admitted that she had seen Mr. Bryan since implementation of the No Contact Order.

getting her keys in order to leave. Mother had previously testified at a hearing that the injury to her hand was a prior work injury. According to Ms. Davis, the three also watched a video that included the July 29th assault by Mr. Bryan upon his minor daughter. Ms. Davis indicated that Mother revealed to her that K.L. was present during one argument between Mother and Mr. Bryan which resulted in Mother backing into another car. Ms. Davis further stated that Mother told her Mr. Bryan used methamphetamine, and Father similarly testified that Mother revealed to him that Mr. Bryan was still abusing drugs.

Mother indicated she was aware of Mr. Bryan's "rap sheet" listing numerous prior domestic offenses, including an attempted strangulation, and a variety of other criminal offenses including a felony drug charge. At the initial hearing, Mother stated that she had cut off contact with Mr. Bryan and was living separately; however, she had instead actually married him two weeks before the hearing and was staying at his house. Mother called off visitation with K.L. several times due to arguments with Mr. Bryan, and she failed to exercise her supervised visitation time on multiple other occasions.

Despite his acts of violence and criminality, Mother testified she saw nothing wrong with having Mr. Bryan around K.L. She also testified that she would not end her relationship with Mr. Bryan even if the court found he was a risk of harm to the child. She quit her job as a nurse to work for Mr. Bryan and is now financially dependent on him.

Mother conceded that she could not guarantee K.L. would not be harmed. Father agreed, testifying, "if [Mother] can't stop [Mr. Bryan] from injuring her there's no way she can stop him from injuring [K.L.]." Mother further recognized that, since the Parenting Plan was entered, change has occurred. Mother, however, testified that she did not see anything wrong with her current living situation, believing that K.L. was not at risk of danger because she and Mr. Bryan both had changed since the incidents in question.

Mother's counsel emphasized that K.L. had not been physically abused or present when any of the incidents or fights occurred. Father alleged that K.L. had been present for a fight between Mother and Mr. Bryan, and Ms. Davis offered testimony in support of such contention. Father also countered that the only basis for a conclusion that K.L. was not present when Mother and Mr. Bryan fought is Mother's testimony and that Mother had repeatedly been shown to be lacking in credibility regarding Mr. Bryan and his acts of violence. Even assuming Mother's testimony on this point was truthful, Father noted that an environment can be harmful to the child even without direct physical abuse of the child and argued it was not reasonable to wait until abuse happened to K.L. before taking action.

Although it is undisputed that at the time the Parenting Plan was entered, Father was aware of Mother and Mr. Bryan's relationship, and that Mr. Bryan had a previous felony drug charge, Father testified that he did not have complete knowledge of Mr. Bryan's criminal history, the current drug use in the home, or his physical abuse. It was not until after the Parenting Plan was entered that Mr. Bryan's extensive criminal history was

revealed.[4]  Father testified that he would not have agreed to the Parenting Plan had he been made fully aware.  As noted above, there were also multiple incidents of criminality including domestic violence that occurred after entry of the Parenting Plan.

Following the hearing, the Juvenile Court dismissed Mother's Motion for Contempt finding that—although Father did violate the Parenting Plan—Father's actions were not willful.[5]  The Juvenile Court also granted Father's Motion for Modification of the Parenting Plan.  In support of its ruling, the Juvenile Court made findings of fact and reached conclusions of law.

The Juvenile Court concluded that Mother previously perjured herself, leading to the conclusion that Mother is not a credible witness.  More specifically, the Juvenile Court concluded that Mother perjured herself regarding her relationship with Mr. Bryan and perjured herself regarding her living arrangements at the time of her previous testimony.  The court found Mother was not credible regarding abuse involving Mr. Bryan and that she was not truthful about the drug use by Mr. Bryan.  The court also found Mr. Bryan has a history of drug use, a history of domestic violence, has violent felony charges pending in Madison County, and has fifteen prior arrests and five prior convictions.  The court also found that Mr. Bryan had recently engaged in acts of domestic violence and drug use.  The court also found that Father attempted to make arrangements that would allow Mother to safely exercise her visitation with K.L.  These efforts included making arrangements for Mother to visit, making arrangements for Mother to live separately and away from Mr. Bryan, and assisting Mother with transportation of the child.  Irrespective of these efforts, Mother has repeatedly returned to Mr. Bryan.

From the evidence adduced, the Juvenile Court concluded there had been a material change of circumstances and that it would be in the best interest of K.L. to modify the Parenting Plan.  Simply stated, the trial court concluded that Mother's living arrangements "are unsafe for the child."  Accordingly, the Juvenile Court reduced Mother's visitation time to fifty-nine days and mandated that her visitation be supervised.

II.

Mother appeals the trial court's modification of the Parenting Plan.  In reviewing a trial court's modification of a parenting plan, "our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of correctness of the findings, unless the preponderance of the evidence is otherwise." *Armbrister v. Armbrister*, 414 S.W.3d 685, 692 (Tenn. 2013).  "[A]ppellate courts must presume that a trial court's

---

[4] At the Modification Hearing, Mother admitted that she was aware that Mr. Bryan had over fifteen arrests and five convictions.

[5] The Juvenile Court's denial of Mother's Motion for Contempt has not been appealed and is not an issue before the Court.

factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Id.* at 693 (citing Tenn. R. App. P. 13(d)). "A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions." *Id.* at 692.

A trial court's decision to modify a parenting plan "should not be reversed absent an abuse of discretion." *Id.* "An abuse of discretion occurs when the trial court applies incorrect legal standards, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party." *West v. Schofield*, 460 S.W.3d 113, 120 (Tenn. 2015).

III.

Mother contends that the trial court erred in modifying the Parenting Plan. She argues that there was no material change of circumstance in the present case and that modifying the Parenting Plan is not in the best interest of K.L.

For modification of a permanent parenting plan, "the petitioner must prove by a preponderance of the evidence a material change of circumstance affecting the child's best interest." Tenn. Code Ann. § 36-6-101(a)(2)(C) (effective July 1, 2021, to Apr. 10, 2024). Accordingly, when reviewing a modification request, the analysis is twofold: first, courts must assess whether a material change in circumstances has occurred; second, if a material change in circumstances has occurred, courts then must apply the best interest factors set forth in Tennessee Code Annotated section 36-6-106(a) to determine if modification would be in the best interest of the child. *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 496 (Tenn. 2017) ("[T]he court must first determine if a material change in circumstances has occurred and then apply the 'best interest' factors of section 36-6-106(a).").

Accordingly, we turn first to considering whether a material change in circumstances has occurred. *See* Tenn. Code Ann. § 36-6-101(a)(2)(C). The relevant statute provides a non-exhaustive list of examples of material changes of circumstances, including:

> significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting; failure to adhere to the parenting plan; or other circumstances making a change in the residential parenting time in the best interest of the child.

*Id.*

Courts have recognized that "section 36-6-101(a)(2)(C) sets a low threshold for

- 6 -

establishing a material change in circumstances when a party seeks to modify a residential parenting plan." *Armbrister*, 414 S.W.3d at 703 (internal citations and quotation marks omitted); *see also Boyer v. Heimermann*, 238 S.W.3d 249, 257 (Tenn. Ct. App. 2007) (stating that although a "change must be 'significant' before it will be considered material," courts have emphasized that "Tenn. Code. Ann. § 36-6-101(a)(2)(C) sets 'a very low threshold for establishing a material change of circumstances'" (quoting *Rose v. Lashlee*, No. M2005-00361-COA-R3-CV, 2006 WL 2390980, at *2 n. 3 (Tenn. Ct. App. Aug. 18, 2006))); *Massey-Holt v. Holt*, 255 S.W.3d 603, 608 (Tenn. Ct. App. 2007) ("[T]he addition of § 36-6-101(a)(2)(C), establishes different criteria and a lower threshold for modification of a residential parenting schedule." (quoting *Scofield v. Scofield*, M2006-00350-COA-R3-CV, 2007 WL 624351, at *3 (Tenn. Ct. App. Feb. 28, 2007))). Ultimately, "the enactment of section 36-6-101(a)(2)(C) reflects the General Assembly's 'policy decision to make it easier to establish that a material change in circumstances has occurred' when a party seeks to modify a residential parenting schedule." *Armbrister*, 414 S.W.3d at 703 (quoting *Boyer*, 238 S.W.3d at 259). The Supreme Court of Tennessee has emphasized that anticipated or foreseeable changes can still constitute material changes "so long as the party seeking modification has proven by a preponderance of the evidence 'a material change of circumstance affecting the child's best interest.'" *Id.* at 704 (quoting Tenn. Code. Ann. § 36-6-101(a)(2)(C)).

A change of a home environment via the impact of the actions of a parent's significant other can potentially constitute a basis for a material change of circumstance. *In re T.C.D.*, 261 S.W.3d 734, 744 (Tenn Ct. App. 2007); *see also Tortorich v. Erickson*, 675 S.W.2d. 190, 191 (Tenn. Ct. App. 1984) (finding there to be a material change in circumstances, relying on the "character of the mother's new husband"). For example, in *In re T.C.D.*, following entry of a final parenting plan, the mother married a new husband, who had felony criminal convictions and a history of domestic abuse. *Id.* at 737-38, 745. The father petitioned for modification of the custody arrangement. *Id.* at 736.[6] Concern arose due to "Mother's apparent cavalier attitude towards the character and conduct of [her new husband]." *Id.* at 745. The court ultimately concluded that the marriage and introduction by mother of her new husband constituted a material change in light of "the character, history, and conduct of [the new husband], coupled with the indifferent attitude of Mother." *Id.* at 746. This court clarified that "a material change of circumstances does

---

[6] Although *In re T.C.D.* addresses modification of custody, the holding is instructive on what constitutes a material change in the present case because the burden of proving a material change in circumstances is more demanding for modification of custody as compared to modification of a parenting plan. *See Rushing v. Strickland*, 692 S.W.3d 82, 90 (Tenn. Ct. App. 2023) (holding "that a lower threshold of proof applies to a material change in circumstance to justify a change in the residential parenting schedule" as compared to the threshold required for modification of custody); *see also Tutor v. Tutor*, No. W2019-00544-COA-R3-CV, 2020 WL 1158075, at *2 (Tenn. Ct. App. Mar. 10, 2020) ("Tennessee courts have required a higher measure of proof when the petitioner seeks a change in custody (*i.e.*, a change in the primary residential parent) than when he or she seeks only a change in the existing parenting schedule." ).

not require a 'showing of substantial risk of harm' to the child." *Id.* at 745 (citing Tenn. Code Ann. § 36-6-101(a)(2)(B)).[7]

Another instructive case is *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521 (Tenn. Ct. App. Nov. 25, 2003). In *McEvoy*, the father filed a petition to change the custody arrangement.[8] *Id.* at *2. Following entry of the custody agreement, the mother married a man who the court concluded posed "a credible threat of domestic abuse or violence toward the child." *Id.* at *1. The court specifically found that the new husband had a violent disposition, abused the mother, abused his biological son, and abused a former girlfriend. *Id.* at *4. In *McEvoy*, the minor child had not suffered abuse, but the court stated that "does not mean that she had not been affected materially by being exposed to his abusive treatment of others. Being exposed to domestic violence can have an immediate and long-term effect on a child, even if the child is not a victim of the abuse." *Id.* Ultimately the court concluded that the mother's marriage to her abuser provides "ample basis for the general sessions court's conclusion that a material change in circumstances occurred." *Id.*

In the present case, the evidence does not preponderate against the trial court's finding of a material change in circumstances. The Juvenile Court's findings of fact illustrate, and the record supports, a material change of circumstance.

In opposition, Mother makes several arguments, none of which we find persuasive. Mother argues that because K.L. has yet to suffer any abuse, there was no material change of circumstances. The threshold for a material change of circumstances is not, however, that a child has suffered abuse. *See* Tenn. Code Ann. § 36-6-101(a)(2)(C). Mother also argues that Father was aware of Mr. Bryan and Mother's relationship prior to entry of the Parenting Plan, and, therefore, Father cannot successfully argue that Mr. Bryan's presence constituted a material change. Although Mother and Mr. Bryan were dating and Father was aware of some of Mr. Bryan's criminal history, it was not until after entry of the Parenting Plan that Father was informed of Mr. Bryan's full criminal record. Assuming for purposes of argument that Mother is correct that Father's lack of knowledge and subsequent discovery of this information cannot be a basis for a material change of circumstance, there are, nevertheless, multiple significant occurrences after entry of the Parenting Plan that provide a basis for a finding of a material change of circumstances.

---

[7] The statutory provision addressing modification of a parenting plan similarly has no requirement to establish or show a substantial risk of harm to the child. Tenn. Code. Ann § 36-6-101(a)(2)(C).

[8] Again, although the *McEvoy* case addresses modification of custody rather than modification of a parenting plan, the material change in circumstances standard is less exacting in parenting plan cases than in custody cases. *See Rushing*, 692 S.W.3d at 90 (holding "that a lower threshold of proof applies to a material change in circumstance to justify a change in the residential parenting schedule" as compared to the threshold required for modification of custody).

Notably, Mr. Bryan engaged in a variety of criminal behavior including acts of domestic violence and other forms of criminal conduct, has used illegal drugs, and made threats against Mother and her family after approval of the plan. Additionally, Mother's attitude in response to such behavior is a subsequent development that raises serious concerns about the safety of K.L. in this environment.

In sum, although Mother and Mr. Bryan were seeing each other at the time the Parenting Plan was entered, which is chronologically distinct from both *McEvoy* and *In re T.C.D.*, significant deeply disturbing behavior occurred after the Parenting Plan was entered, which revealed the environment with Mother and Mr. Bryan to be unsafe for K.L. Ultimately, the unsafe environment created both by Mr. Bryan's behavior and Mother's attitude toward the danger created thereby amounted to a material change in circumstances. Simply stated, the evidence does not preponderate against the trial court's finding of a material change of circumstance.

IV.

Mother also challenges the trial court's determination that modification is in K.L.'s best interest. "[A] finding of a material change in circumstances warranting re-evaluation of the parenting plan does not necessarily require that any change in visitation be made." *In re T.C.D.*, 261 S.W.3d at 746. Instead, once a material change in circumstances is found, courts "must next consider whether the existing parenting plan is no longer in the best interest of the children." *C.W.H.*, 538 S.W.3d at 497.

The best interest factors are as follows:

(1) The strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child;

(2) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order;

(3) Refusal to attend a court ordered parent education seminar may be

- 9 -

considered by the court as a lack of good faith effort in these proceedings;

(4) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(5) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(6) The love, affection, and emotional ties existing between each parent and the child;

(7) The emotional needs and developmental level of the child;

(8) The moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child. The court may order an examination of a party under Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party under § 33-3-105(3). The court order required by § 33-3-105(3) must contain a qualified protective order that limits the dissemination of confidential protected mental health information to the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(9) The child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(10) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(11) Evidence of physical or emotional abuse to the child, to the other parent or to any other person. The court shall, where appropriate, refer any issues of abuse to juvenile court for further proceedings;

(12) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(13) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(14) Each parent's employment schedule, and the court may make accommodations consistent with those schedules;

(15) Any other factors deemed relevant by the court; and

(16) Whether a parent has failed to pay court-ordered child support for a period of three (3) years or more.

Tenn. Code Ann. § 36-6-106(a) (effective Mar. 18, 2022, to Apr. 22, 2024).

When considering the best interest factors, the court must consider "all of the relevant factors." *C.W.H.*, 538 S.W.3d at 498; *see also Burden v. Burden*, 250 S.W.3d 899, 910 (Tenn. Ct. App. 2007) (indicating the court "shall consider" best interest factors "if they are relevant" (quoting Tenn. Code Ann. § 36-6-106(a))). "Ascertaining a child's best interests does not call for a rote examination of each of [the] factors"; instead "[t]he relevancy and weight to be given to each factor depends on the unique facts of each case." *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005); *see also Burnett v. Burnett*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290, at *6 (Tenn. Ct. App. July 23, 2003) (explaining that although a trial court must "consider all of the listed factors which are applicable … the statute does not require a trial court, when issuing a memorandum opinion or final judgment, to list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination").

In the present case, Mother argues that the court baselessly concluded that modification was in the best interest of K.L. We disagree. The Juvenile Court made findings indicating its concern relating to "Mr. Bryan['s] … history of domestic violence and drug use," Mr. Bryan's criminal history, and Mother's indifference toward the "living arrangements that are unsafe for the child." The record supports these findings.

In this particular case, a number of factors are especially relevant in assessing K.L.'s best interest. These include factors eight (8), nine (9), eleven (11), and twelve (12). *See* Tenn. Code Ann. § 36-6-106(a)(8)–(9), (11)–(12).[9]

Regarding factor eight (8), the record in this matter reflects understandable serious

---

[9] Factor two provides for considering "any history of either parent or any caregiver denying parenting time to either parent in violation of a court order." Tenn. Code Ann. § 36-6-106(a)(2). Although Father did refuse to return K.L. to Mother on one occasion, the occasion that ultimately gave rise to the beginning of this lawsuit, the record establishes Father's history of honoring parenting time and his willingness to work with Mother. The trial court below explicitly found that although Father did violate the Parenting Plan when he withheld K.L., his actions were not willful. Furthermore, the court below expressly found that Father attempted to make arrangements that would allow Mother to safely exercise her visitation with K.L.

- 11 -

concerns regarding Mother's ability and fitness to parent K.L. The record demonstrates serious concerns with Mother's approach to the presence of a significant other, who is engaged in acts of violence and criminality including domestic abuse. Mother's actions reflect concern for protecting her relationship with Mr. Bryan at the potential expense of the safety of her child and her relationship with her child. This factor significantly calls into question Mother's fitness as it relates to her ability to parent. Regarding factors nine (9), eleven (11), and twelve (12), an important consideration is the character and behavior of other people who reside in the home and who interact with the child. The record contains evidence not only establishing Mr. Bryan's violent behavior and drug use but also evidence of domestic physical abuse of both Mother and a minor child. As to Mr. Bryan's character and behavior, the Juvenile Court concluded Mr. Bryan has a history of drug use and of domestic violence, has violent felony charges pending in Madison County, has fifteen prior arrests, and has five prior convictions. The trial court also found that Mr. Bryan engaged in recent acts of domestic violence and drug use. There were also extreme threats made against Mother and her family. These circumstances, and Mother's response thereto, reveal an unsafe environment created by Mr. Bryan's presence. The trial court concluded, and the record supports, Mr. Bryan's behavior and Mother's attitude in response thereto created an environment where modification of the Parenting Plan is in K.L.'s best interest.

Ultimately, in consideration of the environment created by Mr. Bryan's presence and Mother's inability to appropriately address the dangers presented, the Juvenile Court did not abuse its discretion in concluding modification is in the best interest of K.L.

V.

For the aforementioned reasons, we affirm the judgment of the Juvenile Court for Chester County. Costs of this appeal are taxed to the appellant, Angelea Nicole Flowers, for which execution may issue if necessary.

_____
JEFFREY USMAN, JUDGE